The next case on the calendar, Heaman v. Berryhill. Good morning, Your Honors. I'm Peter Gorton. I'm the attorney for Joshua Heaman. This is a social security disability case. Joshua underwent two unsuccessful back surgeries starting in 2004, finishing in 2012. After each one, there was an initial period that he got a little bit better, as to be expected. But what's important for this case is that at the end, he was actually worse. The case was heard in June of 2015. The last records before June of 2015, in May of 2015, it shows two surgeries, back surgeries failed, resulting in a failed disc herniation at L5-S1, worsening nerve impingement, severe impression upon the right lateral recess, severe impression upon the left lateral recess, pain going back to baseline for the entire time. Joshua wants to work if he can. He went back to college. College is not like work. You don't have to be there moment after moment. Be there every single time. The vocational expert in this case said, in order to satisfy the government's burden, which they have in a social security case of proving that there are a significant number of jobs in the national economy, they have to show that the person can work consistently. The vocational expert said even 8% would start to erode the numbers, and in this case, the numbers are very small anyhow, under 13,000 or around 13,000. At 15%, no jobs, independently and separately, if there's even one absence, no jobs. Our only claim before this court is that the physical conditions, the back problems, result in that. No claim that the psychiatric problems result in it. So just to be clear, what is the RFC that is relevant in this appeal? The RFC that's in question is that the judge found that the conditions, notwithstanding even the testimony of the treating orthopedic surgeon Bennett, found that he would never be off task, found that his condition would never change, he would never have a good day, he would never have a bad day, he would never be absent. That's what the judge found. He also found he could do sedentary work with a bunch of other restrictions, and the vocational expert said, with those restrictions and no time off task and no absenteeism, there are only three jobs and they only have about 13,000 in the economy. So when you discuss the administrative law judge's decision in your brief on page 13, you make reference to the RFC that takes into account Mr. Heeman's substance abuse. That certainly would affect the psych, and that's why we didn't bring in . . . that's why there's nothing in our brief at all that suggests, because you got the two of them and they had a medical expert on the psych and the medical expert said that the substance abuse does raise the psychiatric problems. It doesn't raise any problems with the back. In fact, he's on . . . So when the ALJ considered Joshua's RFC, it did it in the absence, right, of the substance abuse. That is, whether there were any jobs in the national economy that he could perform. Right, and that is why we have not . . . I'm looking at page 13 because I don't have my brief memorized, but that is why we've not raised any psychiatric issue. That's exactly the reason why we've not raised any psychiatric issue. The only issue we raise is that the physical problems, and three different sources, including the orthopedic doctor who saw the claimant on at least 5-13-15, again it was a June 15, 5-1-15, 4-10-15, 1-2-15, 11-8-14, 5-5-14. Sometimes his physician's assistant is looking and then he goes and reviews. Pardon? That's Dr. Bennett. That's Dr. Bennett. And Dr. Bennett . . . Let me ask you about that. How many times in that . . . he saw Bennett for like a year. Yes. How many times did he actually see Bennett, or was it somebody in Bennett's office? Yeah. He saw Bennett, forgive me. I know he didn't . . . on 4-10-15, he saw . . . Mr. Bennett . . . during my time off. I know he saw him 5-3-15, 5-5-14. He specifically says, I reviewed all the records, the MRIs, the records from Dr. Gallion. Dr. Gallion is a neurosurgeon. Who performed the surgeries. Oh my goodness. He did two surgeries, right? Gallion did the one surgery . . . the two surgeries in 2012. The surgery in 2004, I think he was actually in a different jurisdiction. He was . . . forgive me. He was . . . there was a surgery in . . . What's the view here? Well, Gallion would have done the surgeries back in 2012. So, the case came up in 2015. I mean, I can tell you, because I know, Gallion just . . . you know, here are my records. I'm a neurosurgeon. I'm not saying . . . he just doesn't. But, that's neither here nor there. The bottom line is, the last time he saw him was 2012. So, Bennett has been treating him since then, specifically for the problems that arose after the surgeries, after the And Bennett says . . . and the other two doctors who . . . one is a chiropractor, but they all said . . . The other is a primary care physician. Yeah, they . . . and . . . Did I write about those? The three doctors you're relying on are Bennett, who's a neurosurgeon, saw him for the year, and then Stover is a chiropractor, and Koichel is a primary care physician, right? Koichel saw him 13th . . . February 26th. Those are their specialties. That's my question. Well, Bennett . . . Bennett is . . . I'm trying to figure out what they do for a living. Koichel seems to be a primary care physician that treated him for a number of years and was giving him some of the pain medications, right? Correct. And Bennett . . . And Stover is a chiropractor. Yes. And the issue is not so much wait to be given to the doctors. The issue is, there is no other opinion. These are the only opinions . . . and Bennett specifically testifies, these are the only opinions that, because of the . . . and Bennett specifically notes the inflammation causes some days to be good, some days to be bad. He's going to miss more than a day. The judge finds zero absences, zero. And that you're going to fidget, you're going to . . . again, you're going to have a bad day, and you're going to be off task. Nobody says anything other . . . the government cites the psychiatric providers, but obviously . . . About Mogerno, it wasn't . . . Mogerno . . . Mogerno gives marked impairments, is never asked about off task, is never asked whether conditions get better or worse. Marked limitations for squatting, bending, lifting, carrying, but mild limitations for sitting, standing, walking, pushing and pulling. Right. And specifically never asked whether some days better, some days worse, whether there are some parts of the day, or whether the medications might be such that he would off task. They just . . . they don't ask, and Mogerno doesn't cite. There's a number of cases, and forgive me that I don't know them off the top of my head, but there are cases that say when a medical provider is not asked about something, you can't presume he's going to say something else. If you see the eye doctor, he's not going to talk to you about the loss of hearing. Mogerno is never asked, and never opines. There's just no contrary evidence whatsoever. If we were to affirm the ALJ's RFC assessment, how could you . . . is there a way for you to still prevail on your objection to the Step 5 determination? Well, we argue that . . . well, without the . . . there's 13,000 jobs, which is a hair above what the courts allow. The courts allow about ten, and there's some cases under thirteen. The point is that with only 13,000, if the judge looked at all, at the ability to stay on task, or at all, at the absenteeism, then the question is, Mr. Vocational Expert, you've said that there's none at one day. What if it's less than one day, that it starts to erode at eight percent? Is it under 10,000? We don't know that because the judge made the finding zero percent off task, he doesn't have pain, he doesn't have fatigue, the medications don't cause side effects, he doesn't have a need to rest, he has no time off task, and he has no absenteeism. It was never given to the vocational expert. Thank you. Thank you. Good morning. May it please the court. Ben Labraham, appearing on behalf of the Commissioner of Social Security. The Commissioner respectfully submits that the ALJ's decision in this case, specifically the residual functional capacity for a range of unskilled sedentary work, is supported by substantial evidence. That evidence includes medical opinion evidence, clinical findings, as well as non-medical evidence. We respectfully disagree with Mr. Heman's position that this court's decision in Smith v. Berryhill was decided incorrectly. In that case, in the Smith case, Mr. Smith, who was represented by the same counsel in this case, submitted three treating physician opinions that assess limitations with regard to staying on task at work, and the need for a sit-stand option, and argued in Smith, as he has argued, as Mr. Heman argues in this case, that the ALJ was required to cite specific contrary evidence, otherwise the ALJ would have to adopt those limitations into the residual functional capacity determination. You help me understand, as a layperson, how the evidence that the ALJ refers to is inconsistent with the opinions of Mr. Heman's physicians. Just to give an example, if you could help me understand. How does the ability to rise from a chair without difficulty, and to walk without a limp, and only moderate issues with the lumbar spine, affect or bear on the capacity of Mr. Heman to remain on task and maintain regular attendance? Sure. It's our position, Your Honor, that with regard to the three opinions, Your Honor is referring to Drs. Stover, Dr. Coykel, and Dr. Bennett, I would first note that none of those physicians actually cited any findings or any evidence to support those limitations. The burden is upon Mr. Heman to show that there is medical evidence that supports a residual functional capacity that exceeds what was determined by the ALJ. And here, the ALJ not only cited mild to moderate clinical findings, but we also have, contrary to what Mr. Heman asserts, we have directly contrary medical opinion evidence on the specific issues of work pace, sit-stand option, and absenteeism. The crux of this issue gets to Mr. Heman's desire to separate the psychiatric opinions from the medical opinions, and have the court only focus on the medical opinions. However, we submit that agency policy and really the practice of medicine doesn't allow that. Under agency policy, pain is a symptom, and its functional impact can be both mental and physical. And to this point, Dr. Brown, Mr. Heman's treating psychologist, specifically noted the relationship between his back pain and his mental impairment. And Dr. Coykel, upon whom Mr. Heman relies, also saw him for his psychiatric mental health complaints. So, and probably most importantly, the very forms upon which Mr. Heman relies, specifically these off, being off task at work, that form itself states whether due to diminished concentration. So the form itself contemplates the relationship between the physical and the mental components of pain. Well, let's say, looking at Dr. Effabee's assessment, where do you see him taking into account the back pain? Well, your honor, Dr. Effabee is a medical expert, and he, she, is a psychiatrist. And so as a psychiatrist, she's a medical doctor, she would have had physical medical training before her psychiatric training. First, I'd note that, and second, she's a medical expert, so she's subject to the regulations. Just as consultative examiner, Dr. Morgorno is subject to the regulations, which means they assess a claimant's ability to perform work on an ongoing basis, which means eight hours a day for five days per week. So in that sense, Dr. Effabee, as an expert, is evaluating the whole person, and did not assess any such limitations. Can you talk about Dr. Bennett? Because he was a treating neurosurgeon for at least a year, right? Correct. What's wrong with his medical notes? Well, a few things, your honor. From our review of the record, it appears that Dr. Bennett only actually examined Mr. Heeman on one occasion, and on a subsequent visit, administered an injection. It appears from our view of the record that most of the actual evaluations were done by his physician's assistant, Donahue. There are other issues with Dr. Bennett's opinion as well. Importantly, just a few months after issuing this medical source opinion in January 2015, in a note co-signed by Dr. Bennett, Dr. Bennett says the only limitations that Mr. Heeman has are from heavy lifting, bending, and twisting, and that he can continue to go to college. So that stands in contrast to his May 2015 medical source statement. Further, when we look at the findings when Dr. Bennett actually examined Mr. Heeman, the findings don't support the medical source statement. Dr. Bennett noted he didn't use assistive devices, there was only moderate findings, a negative straight leg raising test, which speaks directly to low back pain, and the neurological examination was normal. So, for those reasons, we believe that the ALJ properly gave Dr. Bennett's opinion less weight. What about your contention that Mr. Heeman hasn't proven the need to change positions? So, his physician said that he should alternate between sitting stand every 30 minutes and every hour. How is that in keeping with the requirements of sedentary work, which, at least as I recall, permits a break every two hours? Correct, Your Honor. So, with regard to the need to change positions alleged by these three opinions, we submit that Dr. Magorno's opinion, she is the physical consultative examiner, that opinion directly refutes these three. Importantly, in Dr. Magorno's medical, as she took Mr. Heeman's medical history and accounted for his symptoms, one of the things that Mr. Heeman stated is that he was unable to stand or sit for more than 30 minutes and would have to lie down if he had to do more than that. So, Dr. Magorno was well aware of this complaint, of the allegation that he could not stand or sit for more than 30 minutes, the need to change positions. And in consideration of that, and all the medical history, and a thorough physical exam, Dr. Magorno did not assess any such limitation. So, we submit that Dr. Magorno's opinion directly refutes that need. Furthermore, she was a primary care physician too, right? Excuse me? Magorno was a primary care physician, internal medicine, right? Right, an internal medicine doctor, correct. And Dr. Ofobi was a psychiatrist, right? I'm always surprised why the agency doesn't have a orthopedic surgeon or a neurosurgeon do examinations, consultative examinations in a case like this, when there's a rich history of orthopedic problems. Why not? Why not have that kind of doctor? Your Honor, I can't speak to why that didn't happen in this particular case. I have personally had cases where examiners did have such specialties, but I'm unable to tell you why that didn't happen in this case. However, I would note that Dr. Magorno is an internal medicine physician, so that would mean that she had extensive training in all body systems, including orthopedics, not a specialist, but nonetheless could treat. And practically speaking, an individual with orthopedic problems would start with their primary care physician and could be treated by that physician without seeing a specialist. Thank you. Thank you. Mr. Gordon. Thank you, Your Honor. Real briefly on Smith, we note the two cases, Flynn and Messina, afterwards that came to opposite conclusions, but we also note, because this happened after our briefing came in, forgive me, very specifically on Smith, which is fact specific, does not have the same facts as this, does not have somebody who's gone through the surgery and it's gotten worse. Very specifically on Smith, the commissioner said, this is worthy of being precedential and asked that it be published. And I can send it to the court, but I assume that it's easy enough to find. And the court very specifically said, no publishing, it's case specific. This is a different case, different facts. Everything is different. With respect to their argument on the psychologist . . . Did they actually say, we're not going to publish because it's case specific? No, they said, we're not going to publish. But clearly, I mean, you can look at the briefing. The briefing on it, the commissioner said, it should be published because of what's in there. And we said, it's case specific. And they said, we're not going to publish. So I agree. I maybe went a little bit too far. With respect to the psychiatrist, there are a couple things. Yes, pain can cause depression, which could add to the off task and absenteeism. We're not arguing that. We're not. We're saying, it's the pain from the condition, the fatigue caused by it, the fact that it goes back and forth. No psychiatrist was asked to opine on that. If you ask me how much money is in my pocket, I'm not going to tell you. I've got a really nice purple tie. The psychiatrists were not asked to opine on physical. They did not opine on physical. That's the one good thing about Smith, is it does have that sentence in there that says the same thing. So that, and I forgot what else I was going to say, so I think I'm done unless you have questions. Thank you. Thank you both for your arguments. The final case, Conti versus Ferguson is on submission. The clerk will adjourn court.